STATE of Missouri, Respondent,

v.

Martin LINK, Appellant.

No. SC 78466.

Supreme Court of Missouri,
En Banc.

Aug. 1, 2000.

Rehearing Denied Sept. 12, 2000.

J. Christopher Spangler, Sedalia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Atty. Gen., Jefferson City, for Respondent.

STEPHEN N. LIMBAUGH, Jr., Judge.

Martin Link was convicted by a jury in the Circuit Court of the City of St. Louis of kidnapping, section 565.110, RSMo 1986, forcible rape, section 566.030, RSMo Supp. 1990, and murder in the first degree, section 565.020, RSMo Supp. 1990, and the trial court, following the jury's recommendation, sentenced Link to death. The post-conviction court overruled his Rule 29.15 motion after an evidentiary hearing. Because the death penalty was imposed, this Court has exclusive jurisdiction of the appeals. Mo. CONST. art. V, sec. 3; Order of June 16, 1988. The judgments are affirmed.

## I. FACTS

The facts, which this Court reviews in the light most favorable to the verdict, *State v. Ferguson*, 20 S.W.3d 485, 491 (Mo. banc 2000), are as follows:

On Friday, January 11, 1991, just before 6:30 a.m., eleven-year-old Elissa Self left her house at 3844 Humphrey Street in South St. Louis to walk less than three blocks to catch her bus to Enright Classical Junior Academy, a school for gifted children. It was a cold, rainy morning, and Elissa's mother insisted that she wear boots and carry an umbrella. Elissa never arrived at school, and at about 8:20 a.m. the school called Elissa's parents to tell them that Elissa was not present. Elissa's parents drove around the neighborhood looking for her, but they were unable to find her, and they went home and called the police.

During the next four days, police canvassed the neighborhood, interviewed possible witnesses, and investigated calls and letters on possible sightings. On Tuesday, January 15, 1991, two persons who were scavenging at the Black Bridge recreation area along the St. Francis River, 135 miles south of St. Louis in Wayne County, found Elissa's body in a large pile of debris that had washed up on the riverbank. Police soon searched the area and found Elissa's boots, but none of her other belongings. One of the small boulders that defined the perimeter of the parking area had been pushed out of place, and there was a tire rut in the gravel leading up to that boulder.

Elissa's body was autopsied twice. The autopsies revealed two fresh oval-shaped bruises on Elissa's upper left arm, which were consistent with someone grabbing her arm tightly. Her lips were bruised and torn on the inside from being pressed against her teeth. The autopsies also showed that she had been raped. Her external genitalia were bruised and swollen, and there was a five-millimeter tear in the area leading to her vagina. Her hymen had been torn as well. Inflammation had begun in her vagina, and blood in her panties had partially dried, indicating that she survived for some time after the rape.

The cause of death was ligature strangulation. There were two long, thin bruises, about five to seven millimeters wide, around her entire neck. These bruises were consistent with a cord having been wrapped completely around her neck, with each end of the cord held in front of her. A pathologist testified that Elissa had been strangled to death slowly, losing consciousness after about five to ten minutes and dying after about thirty minutes. Although she still may have been alive when her body was dumped in the river, the amount of brain damage she sustained from the strangulation indicated that she never would have regained consciousness. Because the cold water had preserved her body, the time of death could be established only during the interval between the time of her kidnapping to twenty-four hours before she was found.

At about 9:24 p.m., on January 26, 1991, eleven days after Elissa's body was found, a City of Kirkwood police officer saw Martin Link driving with a headlight out and attempted to pull him over. Link led the officer on a high-speed chase, eventually crashing his car into a telephone pole, and was then taken into custody. In a search of the car, officers found a jar of petroleum jelly with Link's fingerprints on the jar and flecks of blood embedded in the jelly. In addition, officers took tape lifts from the inside of the car in order to obtain fiber evidence.

During the investigation, officers discovered that Link had grown up five blocks from where Elissa was kidnapped and had attended the school near Elissa's bus stop. In the early 1980s, Link lived in a house less than a mile away from the Black Bridge recreation area, the place where Elissa's body was found. At the time Link was arrested, he was living in South St. Louis, about 1½ miles from where Elissa was kidnapped.

Officers also discovered that Link was registered at a motel just outside of St. Louis from January 9, 1991 to January 11, 1991. Link checked out at an unknown time on January 11, the morning that Elissa was kidnapped. That night, at about 1:55 a.m. on January 12, Link checked into a motel in Desloge, Missouri, which is about seventy miles north of Black Bridge on a direct route from Black Bridge to St. Louis. A witness noted that Link's car was loud, "like a car that had a bad muffler on it." At about 8:30 a.m., Link called the S & S Muffler shop and "was very insistent" that he get his car fixed that day. He was told to bring in the car that afternoon and did so at 2:30 p.m. He explained to the employees that he was coming from further south and that he had to get his muffler fixed or else he would get a ticket in St. Louis. While he was at the shop, he kept pacing in the waiting room and checking to see if the work on his car was finished.

While a mechanic was working underneath Link's car, clumps of orange clay of the same type found in the St. Francis riverbed fell from the bottom of the car. The tailpipe was bent and broken loose from the muffler, and the muffler had been hit by something that smashed and punctured it. The muffler of Link's car had twelve inches of clearance, which was also the height of the rock that had been moved out of place at Black Bridge, where Elissa's body was found.

As part of the investigation, a special agent at the FBI crime laboratory compared three fibers found on the front passenger seat of Link's car with fibers from the sweater Elissa had been wearing when she was kidnapped. The agent determined that the fibers found in Link's car were "consistent with having come from the victim's sweater."

DNA tests conducted by two different labs showed that Link's DNA matched the DNA found in sperm cells on vaginal swabs taken from Elissa's body. The state's DNA expert set the odds of such a match at one in 6,600. The testing also revealed that Elissa's DNA matched the DNA in the blood found in the petroleum jelly jar seized from Link's car. The odds of that match were one in 48. The joint probability of both of these matches occurring by chance was less than one in 300,000.

Link did not testify at trial, but he called two witnesses who had reported seeing Elissa after 6:30 a.m. on January 11, 1991. He also called a detective who had worked with one of these witnesses to make a composite drawing of a man she allegedly saw with Elissa, but who did not resemble Link. He also called two witnesses who worked as buyers in the clothing industry to testify to the large number of cotton/ramie sweaters, like the one Elissa wore, that were imported every year. He called two DNA experts to testify that the DNA tests performed by the other two laboratories were faulty. In addition, one of the DNA experts and a third expert testified that the state's conclusions about the probabilities of Link's DNA being found in the sperm on the vaginal swab and Elissa's DNA being found in the blood in the petroleum jelly jar were incorrect. Finally, Link called an accident reconstructionist who testified that the boulder at Black Bridge could not have damaged the muffler on Link's car.

In rebuttal, the state presented its own accident reconstruction evidence. Investigating officers testified that they obtained a car of the same year and model, with the same kind of tires, bumper arrangement, and exhaust system as Link's car. They backed the car up to the boulder that had been moved out of place at Black Bridge, whereupon the tailpipe and muffler made contact with the boulder, thus showing that the boulder could have caused the damage to Link's car.

At the close of the evidence, instructions, and arguments, the jury found Link guilty of kidnapping, forcible rape, and murder in the first degree.

During the penalty phase, the state called Elissa's father, mother, stepfather, stepmother, and older sister to give victim impact testimony. The state also called several witnesses to testify about Link's lengthy criminal history, which included, 1) that on June 1, 1982, at about 7:30 a.m., Link jumped in front of a 13–year–old girl in an alley in St. Louis, held a knife to her throat, pulled her into a garage, attempted to rape her, then forced her to perform oral sex on him; 2) that on March 16, 1983, at about 9:30 p.m., Link kidnapped a 15–year–old girl in South St. Louis, drove her to East St. Louis, raped her, and left her under a bridge (crimes for which he was convicted and sentenced to twenty years of imprisonment, but was paroled in 1989); 3) that on November 27, 1989, Link solicited an undercover police officer in St. Louis for prostitution; 4) that on December 12, 1990, Link stole the car that was used to kidnap Elissa; 5) that on January 23, 1991, Link stole a purse from a 71–year–old woman in South St. Louis, and later that day, he attempted to cash one of her checks; 6) that later on January 23, 1991, Link walked into a laundromat, raped a woman at knife-point and then kidnapped her, although she escaped by jumping, half-naked, from his car when he stopped at a stop sign; 7) that on January 25, 1991, at about 10:30 a.m., in Cuba, Missouri, Link broke into a home, ordered a woman in the home to put her baby down, robbed her at knife-point, raped her twice, and held a pillow over her face until he was startled by a noise, and then quickly left after cutting the phone cord; 8) that at about 6:30 p.m. on that same evening, Link attempted to grab an eight-year-old girl in an alley, but she ran into her house; and 9) that, again on the same evening, Link walked into a Baskin–Robbins, held a knife to a 16–year–old female employee and demanded money, but fled when she sounded the buzzer on the cash register.

At the beginning of Link's penalty phase evidence, his counsel read to the jury a stipulation regarding his incarceration records. The stipulation stated that Link's conduct in jail was always good except for one incident in which he stole some fish, that he had successfully participated in a drug rehabilitation program, that he participated in other rehabilitation programs, and that he had successfully completed a GED program. He also called an investigator who testified that Link was ostracized by his own family, including his daughter, that his stepfather rarely had contact with Link because he worked the night shift, and that little information was known about Link's family tree.

At the close of penalty phase evidence, instructions, and arguments, the jury found the existence of two aggravating circumstances: 1) that the murder involved depravity of mind and as a result was outrageously vile, horrible, and inhuman, in that Link murdered Elissa after she was rendered helpless; and 2) that he murdered Elissa while engaged in the perpetration of rape and kidnapping. The jury recommended that Link receive the death sentence for murder in the first degree, and the trial court sentenced him accordingly. The trial court also sentenced Link to consecutive sentences of fifteen years imprisonment for kidnapping and life imprisonment for forcible rape.

Link filed an amended motion for post-conviction relief on March 27, 1997. The motion court held an evidentiary hearing on November 9 and 10, 1998, and allowed Link to present additional evidence by way of depositions. On July 2, 1999, the motion court entered findings of fact and conclusions of law, overruling Link's motion for post-conviction relief. This consolidated appeal follows.

## II. ALLEGATIONS OF TRIAL COURT ERROR

### A. Officer Maher's and Officer Flaherty's Testimony

Link first claims that the trial court abused its discretion in allowing Officers Gary Maher and Michael Flaherty to testi-

fy that defense witness Caroline Burke's reported sighting of Elissa the morning of the kidnapping was a "false sighting." This testimony, Link explains, was "nothing more than opinions by the witnesses that Burke was not a credible witness," and, as such, the testimony "invaded the province of the jury."

■ Preliminarily, the parties contest whether this point was preserved for review. The transcript reflects that the prosecutor asked Officer Maher: "With regard to your conversations with Carol Burke, did you determine whether that was a valid or false sighting?" When the witness responded, "It was a false sighting," defense counsel immediately objected "to the opinion of this officer." Although the state contends that the objection was untimely because the witness had already answered the question, defense counsel had no reason to object before the answer was given. The witness was not asked to give his opinion, but only whether he had an opinion, and an objection at that point would have been premature. Though counsel could have moved for the answer to be stricken as unresponsive, the objection actually made was equally proper and was not untimely.

■ On the other hand, the objection made to the false sightings testimony of Officer Flaherty was insufficient. Defense counsel stated only that "I would renew my objection," without specifying what objection was being renewed. In fact, the objection previous to the "renewal" – the objection to which the renewal logically referred – was an objection to hearsay, not an objection to improper opinion testimony. Accordingly, Officer Flaherty's testimony is reviewable only for plain error upon a showing of manifest injustice under Rule 30.20.

■ On the merits of that part of Link's claim pertaining to the testimony of Officer Maher, the general rule is that expert testimony is inadmissible if it relates to the credibility of witnesses because it invades the province of the jury. *State v. Middleton*, 998 S.W.2d 520, 527 (Mo. banc 1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1189, 145 L.Ed.2d 1094 (2000). However, it is proper for a witness to testify to specific facts that discredit the testimony of another witness, as long as the witness does not comment directly on the truthfulness of another witness. *Stone v. City of Columbia*, 885 S.W.2d 744, 747–48 (Mo. App.1994). In the present case, it did not invade the province of the jury for Officer Maher to explain the general concept of false sightings. *See State v. Skillicorn*, 944 S.W.2d 877, 892 (Mo. banc 1997), *cert. denied*, 522 U.S. 999, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997) (permissible for FBI agent to explain generic concept that defendants minimize involvement in crime). Nor was it improper for him to state specific facts that tended to discredit Ms. Burke's sighting. *See Stone*, 885 S.W.2d at 747–48. But it was improper for him to go one step further and say that the police classified the information from Ms. Burke as a false sighting.

■ Despite this error in the admission of Officer Maher's testimony, Link has not shown that he was prejudiced, much less that he suffered manifest injustice due to the admission of Officer Flaherty's testimony. Indeed, the officers' testimony was not as damaging as the testimony of Ms. Burke herself. Although at one point Ms. Burke testified that she was positive she saw Elissa, she said seven times during direct examination that she was not sure that she saw Elissa. She said that as she was driving around the day of the sighting, she saw two different girls at two different locations at almost the same time, but she was not sure which of them she thought was Elissa. She said that on the day of the sighting she told her sister, "I'm not sure, but it looks like Elissa." She said that she did not call Elissa's mother that day because she was not sure it was Elissa; that even after she found out that Elissa was missing, she waited two days to

report the sighting to police; that she did not tell Elissa's parents about it when she was with them the day after the sighting; that the reason she did not tell anyone was because at that time she was not sure it was Elissa; and that she only reported the sighting when, after mentioning it to someone at her church, that person took her to a third person who then called the police. Ms. Burke also testified that the day she made the sighting it was "raining and icing," and that she only glanced at the girls as she drove by them and looked at them in her rear-view mirror. Given the weakness of Ms. Burke's testimony, the impropriety of the officers' false sightings testimony was negligible and certainly not prejudicial. The point is denied.

### B. Dr. Moses Schanfield's Testimony

■ Link next claims that the trial court erred in allowing one of the state's DNA experts, Dr. Moses Schanfield, to testify that the report of defense expert Dr. Randell Libby showed that Libby had "no knowledge" of how to interpret mixed stains. This testimony, Link contends, was a direct comment on Dr. Libby's credibility that invaded the province of the jury. As noted, direct comments relating to the truthfulness or credibility of a witness are generally inadmissible. However, an expert witness may testify that he disagrees with the scientific conclusions reached by another expert witness. *State v. Love*, 963 S.W.2d 236, 245 (Mo.App. 1997); *Stone v. City of Columbia*, 885 S.W.2d 744, 747 (Mo.App.1994).

■ Although it is a close question, Dr. Schanfield's "no knowledge" remark was an impermissible comment on Dr. Libby's credibility. However, in the context of Dr. Schanfield's entire testimony, the prejudice to Link was negligible. The record shows that Dr. Schanfield gave a detailed scientific explanation of his disagreement with Dr. Libby's report, that he was harshly critical of the report, and that he stated the report contained "impossible conclusions." The "no knowledge" remark was

made at the end of Dr. Schanfield's rather devastating testimony and could hardly have caused more damage to Link than what had been said before. Absent prejudice, the error in admitting the "no knowledge" remark did not rise to the level of reversible error. The point is denied.

### C. Dr. Martin Tracey's Testimony

■ Link claims that the trial court abused its discretion in overruling his objection to testimony regarding statistical probabilities elicited from Dr. Martin Tracey, another of the state's DNA experts. Dr. Tracey testified that if two people were picked at random, the odds are less than one in 300,000 that 1) the DNA profile of the first person would match the DNA profile of the blood found in the jar of petroleum jelly and 2) the DNA profile of the second person would match the DNA profile of the sperm found on the vaginal swabs. Link argues that this testimony did not meet the standard required by *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), because the method that Dr. Tracey used to arrive at those numbers is not generally accepted in the scientific community.

■ Dr. Tracey arrived at this figure by using the "product rule," which provides, that if two events are independent of each other, the probabilities of each event occurring can be multiplied, and the resulting product is the probability of both events occurring. In the present case, Dr. Tracey multiplied the odds that someone at random would match the DNA profile of the blood found in the petroleum jelly – one in 48 – by the odds that someone at random would match the DNA profile of the semen found on the vaginal swabs – one in 6,600 – to arrive at the probability of both the profiles matching two individuals picked at random. This Court has held that "the product rule is generally accepted in the scientific community, and that population frequency statistics based on the product rule are admissible." *State v. Kinder*, 942 S.W.2d 313, 327 (Mo. banc

1996), *cert. denied,* 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). Link claims, however, that this holding only allows experts to use the product rule to testify about the probability that one sample will match that of someone picked randomly, and it does not allow the expert to testify about the joint probability of two separate samples matching two separate individuals picked at random. Although it is correct that this Court's previous holding did not specifically address joint probability, this Court recognizes that the product rule is simply a mathematical principle that applies equally well for joint probability calculations. Dr. Tracey's testimony, which was based on the product rule, was therefore admissible.

D. Officer William Roach's Testimony

■ Link claims that the trial court erred in admitting Officer William Roach's testimony that there were five suspects, other than Link, who were eliminated in the case. Link argues that this testimony was improper because its "clear import" was that Officer Roach believed Link was guilty, and therefore, like earlier testimony complained of, invaded the province of the jury. Because Link failed to object to the testimony in question, he is only entitled to relief under the plain error/manifest injustice standard. Rule 30.20.

■ Even if this claim had been properly preserved, the trial court did not err in admitting this testimony. It is improper for a witness to directly comment that he thinks that the defendant is innocent or guilty. *See State v. Cason,* 596 S.W.2d 436, 440 (Mo.1980), *cert. denied,* 449 U.S. 982, 101 S.Ct. 397, 66 L.Ed.2d 243 (1980); *State v. Linzia,* 412 S.W.2d 116, 120 (Mo.1967). In the present case, Officer Roach did not testify that he believed Link was guilty, and, instead, merely stated that there were other suspects who had been eliminated. This testimony does not invade the province of the jury, and the trial court did not err in this regard.

Link further complains that Officer Roach's testimony about his reasons for eliminating the suspects – that the suspects had alibis that were supported by other witnesses – constituted improper hearsay testimony. Link did not object on hearsay grounds at trial, and again, his claim is reviewable only under the plain error/manifest injustice standard. Assuming that the testimony was hearsay, the evidence of Link's guilt, and especially the DNA evidence, was overwhelming, and the admission of the testimony did not amount to manifest injustice.

■ On another matter relating to Officer Roach's testimony, Link contends that the trial court erred in allowing the officer to testify that Elissa's sister told him that she found Elissa's umbrella in the alley near her home on the morning Elissa was abducted. Link argues that this testimony was inadmissible hearsay and that it violated his constitutional right to confront witnesses against him. Unlike the other claims, this claim was properly preserved for review.

■ Although the testimony was clearly hearsay, and admission of the testimony was error, the error was not so prejudicial as to require reversal. The underlying rationale for the hearsay rule is for the purpose of securing the trustworthiness of the assertions. *State v. Harris,* 620 S.W.2d 349, 355 (Mo. banc 1981). Courts generally exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and the fact-finder is not able to judge the declarant's demeanor and credibility as a witness. *Bynote v. National Super Markets, Inc.,* 891 S.W.2d 117, 120 (Mo. banc 1995). However, to the extent that a declarant "is available for live testimony, under oath, the 'dangers of hearsay are largely non-existent.'" *State v. Schaal,* 806 S.W.2d 659, 664 (Mo. banc 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992).

In this case, Elissa's sister was available to testify during the guilt phase of the trial, and, in fact, she did testify during penalty phase, telling the jury firsthand that she found Elissa's umbrella in the alley at about 7:30 a.m. on January 11, 1991. These are indeed the kinds of circumstances in which the dangers of hearsay are largely non-existent. For that reason, and considering the overwhelming evidence of Link's guilt, the prejudice was negligible. The point is denied.

### E. Chain of Custody

Link argues that the trial court erred in admitting into evidence state's exhibit 152, a box containing vaginal swabs made during the second autopsy of Elissa's body, because the state did not establish a proper chain of custody. In support, Link cites the testimony of Dr. Michael Graham, the medical examiner who performed the second autopsy and took the vaginal swabs from the body and placed them in the box, who admitted on cross-examination that he did not have any personal knowledge as to how the swabs were handled and stored after he packaged them.

The determination of whether a sufficient chain of custody has been established for the admission of an exhibit is a matter within the sound discretion of the trial court. *State v. Nicklasson*, 967 S.W.2d 596, 617 (Mo. banc 1998), *cert. denied* 525 U.S. 1021, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998). In order to admit exhibits and testimony regarding tests performed on those exhibits, the trial court must be satisfied as to the identity of the exhibits and that the exhibits were in the same condition when tested as when the exhibits were originally obtained. *State v. Mahan*, 971 S.W.2d 307, 317 (Mo. banc 1998); *State v. Strughold*, 973 S.W.2d 876, 886 (Mo.App.1998). This may be proven by evidence establishing a chain of custody, but proof of a chain of custody does not require proof of hand-to-hand custody of the evidence, nor proof that eliminates all possibility that the evidence has been dis-

turbed. *Mahan*, 971 S.W.2d at 317. The trial court may assume, absent a showing of bad faith, ill will or proof, that officials having custody of exhibits properly discharged their duties and that no tampering occurred. *Id.*

In this case, the state's proof of chain of custody was adequate. Dr. Graham testified that he marked and sealed the box in which the vaginal swabs were contained and that he was able to identify the box by marks he put on the box and his handwriting on the box. He further testified that the box was picked up the same day that he took the swabs and was delivered next door to the St. Louis police department laboratory. Dr. Joseph Crow, a criminalist at the laboratory, testified that he received the vaginal swabs, and Harold Messler, chief criminalist of the laboratory, testified that he sent the swabs on to the Serological Research Institute (SERI), a private forensic laboratory. Brian Wraxall, a forensic serologist at SERI, identified exhibit 152 and testified that he received it, but that SERI tested only the vaginal swabs taken from the first autopsy, which were in a different container, and not those taken from the second autopsy. In any event, when SERI completed its testing, both sets of swabs were returned to the police laboratory. Harold Messler received the swabs and sent them to the Analytical Genetic Testing Center (AGTC), another private forensic laboratory. Thomas Wahl from AGTC identified exhibit 152, and testified that he received it from the police laboratory. He also testified that AGTC then performed the DNA tests on the vaginal swabs taken from the second autopsy, but did not repeat the DNA tests performed by SERI on the vaginal swabs taken from the first autopsy. This evidence shows an unbroken chain of custody for the swabs from the second autopsy from the time they were made to the time they were tested. The trial court did not abuse its discretion in admitting exhibit 152. The point is denied.

### F. Closing Argument

Link's next claim pertains to the following remarks made by the prosecutor during the rebuttal portion of the prosecutor's guilt phase closing argument:

Now, just a few closing comments that I want to make. There's a movie – I'm going to give you a little story now. It ain't going to take long. There's a movie that came out a few years ago called "Network." Peter Finch starred in it. And at one point he is so frustrated, he raises the window and screams out his window, "I'm mad as hell and I'm not going to take it anymore."

That is what I would like to see this jury do in this case. An 11–year–old girl was murdered. A helpless child. And it is time for this community to raise the window and tell predators like him [Indicated.] that it's not going to be tolerated, and you're going to pay the price.

* * *

You represent the people of the City of St. Louis here, and you heard through this evidence a terrible, terrible crime has been committed. And you have heard evidence from many, many sources reflecting the best scientific techniques that we could find showing the best police work that has ever been done in this case, and in this particular city. To find one person, and there he sits. [Indicated.]

And it is time for this jury, for us to raise that window and say we're mad as hell and we are not going to take it. Elissa Self–Braun is the victim here. I'm not asking for you to do this for me. I am not asking you to do this for the Self family. I am not asking you to do this for the Braun family. [Held photograph.] I'm asking you to do this for her.

Thank you.

■■■ Link contends that the prosecutor's comments "called upon the jury to

find [him] guilty because of emotion and not based upon the evidence." Because Link's objection at trial was based on other grounds, and he failed to include the claim in his motion for new trial, the claim has not been preserved and is only reviewable under the plain error/manifest injustice standard of Rule 30.20.

■■■ Although this Court has often held that it is proper for a prosecutor to argue that the jury should "send a message" to the community that criminal conduct will not be tolerated, *see, e.g., State v. Phillips*, 940 S.W.2d 512, 520 (Mo. banc 1997); *State v. Simmons*, 944 S.W.2d 165, 182 (Mo. banc 1997), *cert. denied*, 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997), it is improper for a prosecutor to argue that the jury should base its decision on emotions, *State v. Taylor*, 944 S.W.2d 925, 927 (Mo. banc 1997). The prosecutor's argument in this case, though mostly a proper "send a message" argument, goes over the line in calling the jury to "raise that window and say we're mad as hell." It is similar to the kind of raw emotional comments this Court disallowed in *Taylor*, comments that included, "Now is the time you can put your emotion into it. Now is the time that you can show your outrage. Now is the time to get mad." *Id.* Although the comments in *Taylor* constituted reversible error, reversal is inappropriate in the present case. In *Taylor* there was more emphasis on and repetition of the comments, and the comments were not so well set in the context of a send-the-message argument as they were here. Furthermore, the *Taylor* comments were made during penalty phase rather than in guilt phase, as in this case. The jury in *Taylor* could not reach a decision on punishment, suggesting a reasonable probability that, without the improper argument, the jury would have imposed only a life sentence. In contrast, the jury in this case heard the prosecutor's comments only during the determination of guilt or innocence, and the guilt phase evidence was overwhelming, as noted. Finally, and most

important, the argument in *Taylor* was preserved for review by a timely objection, but in this case, the argument was made without objection. Under these circumstances the prosecutor's closing argument did not constitute manifest injustice. The point is denied.

### III. ALLEGATIONS OF RULE 29.15 MOTION COURT ERRORS

#### A. The Motion Court's Findings and Conclusions

Link claims that the motion court erred in adopting the state's proposed findings of fact and conclusions of law almost verbatim, which shows, he contends, that the motion court failed to thoughtfully and carefully review the proposed findings. In support, Link points to five alleged errors in the 23–page order.

In the absence of independent evidence that the court failed to thoughtfully and carefully consider the claims, "there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties." *State v. Ferguson*, 20 S.W.3d 485, 510 (Mo. banc 2000) (quoting *State v. Kenley*, 952 S.W.2d 250, 261 (Mo. banc 1997), *cert. denied*, 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998)). Moreover, a minor error in the motion court's findings does not establish that the court did not carefully consider the state's proposed findings. *State v. Phillips*, 940 S.W.2d 512, 521 (Mo. banc 1997).

The five errors that Link identifies in this case are either minor errors or not errors at all, and none of the errors establish that the court failed to thoughtfully and carefully consider the claims. An extended opinion on this point would have no precedential value. The point is denied.

#### B. Ineffective Assistance of Counsel

Link's final claim is that the motion court clearly erred in finding that counsel was not ineffective in penalty phase for failing to present expert testimony on the abuse he suffered as a child. Link underwent pretrial psychological evaluations by Dr. Pat Fleming, a licensed psychologist, on three occasions. In addition to determining that Link had been physically abused by his mother and first stepfather and that Link had long-standing substance abuse problems, Dr. Fleming reported that:

> Mr. Link was hesitant to describe happenings in his life, but briefly stated that he was sexually molested by an older man who lived nearby. Given the nature of his crimes, it is probable that the abuse was not a single episode, but Mr. Link would not provide additional information.

> \* \* \*

> The results from the evaluation are not felt to be complete nor adequate. It is highly recommended that another examiner, ideally a black male, might be more effective in establishing rapport.

Link now claims that counsel was ineffective for failing to contact Dr. Donald Cross, a black male examiner, with whom Link's counsel was aquainted. Dr. Cross eventually did examine Link, but not until he was requested to do so by post-conviction counsel. Link submitted Cross's 69–page report to the motion court as an exhibit and points out that the report contains additional and more detailed information regarding the alleged physical and sexual abuse that he suffered than that in Dr. Fleming's report. Dr. Cross stated that he thought that Link was abused as a child, but he did not offer that opinion within a reasonable degree of scientific certainty.

The standard of review of the motion court's action is limited to a determination of whether the findings and conclusions of the court are clearly erroneous. *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). The court's rulings are presumed correct and will be found clearly

erroneous only if, upon a review of the entire record, the appellate court is left with a definite and firm impression that a mistake has been made. *Id.*

In order to prevail on a claim of ineffective assistance of counsel, Link must prove by a preponderance of the evidence that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise in similar circumstances, and that he was prejudiced as a result. *State v. Clay*, 975 S.W.2d 121, 135 (Mo. banc 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To prove that he was prejudiced, Link must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* In addition, the decision not to call a witness to testify, as a matter of trial strategy, is "virtually unchallengeable" as a claim of ineffective assistance of counsel. *Leisure v. State*, 828 S.W.2d 872, 875 (Mo. banc 1992), *cert. denied*, 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992).

In the present case, just before penalty phase began, the prosecutor, who was concerned that Link might later try to claim that counsel was ineffective for failing to present any psychological experts, asked Link's attorney to make a record as to why he was not calling such experts. Counsel responded:

> [A]s an officer of the court and as a counselor at law, I will represent to the court that as an attorney this is my fourteenth death penalty actual trial much less the number of death penalty cases I've handled, and I have used psychological testimony in the past in litigation cases, and at times I haven't. And based on my experience and training and information that's provided to me in this case through a number of different avenues, I have made a conscious choice not to put that on.

Later, counsel stated that he "made a conscious choice not to open the door to any evidence as to [Link's] personality disorders, or mental makeup," and then asked that the prosecutor be prevented from putting on its psychologist in rebuttal. After the court granted the request, counsel agreed with the prosecutor's characterization of his decision not to put on any psychological experts as one "based on tactics and strategy."

Link has failed to show that the motion court's findings were clearly erroneous. Counsel testified at the post-conviction hearing that he was aware that testimony of both his experts and the state's experts would show that Link had no mental disease or defect, that he had a fixation on having sex with young girls, that he was anti-social, that he would repeat his criminal behavior, and that he would kill again. Accordingly, counsel's strategy was to keep out as much of Link's life as possible, and then preach a "sermon" against imposing the death penalty on someone they knew so little about. Ultimately, counsel made a conscious decision not to pursue or introduce psychological evidence from any source and that decision was entirely a matter of trial strategy.

Even if it could be said that counsel was ineffective in failing to contact Dr. Cross, Link has not met the prejudice part of the *Strickland* standard. As noted, if Dr. Cross had testified, the state would have called its own expert, who would have presented devastating testimony about Link's state of mind. Further, Dr. Cross's report contained evidence that Link lied to Dr. Cross and tried to fake his test results, and it verifies other expert opinions that Link is anti-social, aggressive, and a serial rapist. On this record, there is no reasonable probability that the jury would have come to a different result. The point is denied.

## IV. PROPORTIONALITY REVIEW

Under section 565.035.3, RSMo 1994, this Court is required to determine:

**150**

1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2) Whether a statutory aggravating circumstance and any other circumstances found by the trier of fact were supported by the evidence; and

3) Whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

 From this Court's review of the record, there is no evidence that the sentence of death was imposed under the influence of passion or prejudice or any other arbitrary factors. Further, the evidence amply supports the two statutory aggravators found by the jury: 1) that the murder of the victim was outrageously or wantonly vile, horrible or inhuman, and 2) that the murder was committed while Link was engaged in the perpetration of kidnapping and rape. Finally, the imposition of the death penalty in this case is neither excessive nor disproportionate. In that regard, the strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Link's favor. In addition, this case is like many others where the death penalty has been imposed against defendants who have murdered victims they had abducted and against whom they had committed sexual offenses. *See, e. g., State v. Ferguson,* 20 S.W.3d 485 (Mo. banc 2000); *State v. Brooks,* 960 S.W.2d 479, 502 (Mo. banc 1997), *cert. denied,* 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998); *State v. Nunley,* 923 S.W.2d 911, 926 (Mo. banc 1996), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997); *State v. Brown,* 902 S.W.2d 278 (Mo. banc 1995), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); *State v. Lingar,* 726 S.W.2d 728, 741–42 (Mo. banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

### CONCLUSION

For the foregoing reasons, the judgments are affirmed.

All concur.