**STATE of Missouri, Plaintiff–Respondent,**

v.

**Ricky L. JONES, Defendant–Appellant.**

No. 27120.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 22, 2006.

Motion for Rehearing or Reconsideration Denied Oct. 13, 2006.

Application for Transfer Denied Nov. 21, 2006.

James M. Kelly, Republic, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Chief Judge.

Ricky Jones (Defendant) was charged by information with the commission of two crimes: (1) Count I—the class B felony of possession of methamphetamine, a controlled substance, in violation of § 195.285; and (2) Count II—the class D felony of unlawful use of a weapon for knowingly carrying a cane sword in violation of § 571.030.[1] After a bench trial, Defendant was convicted on Count I and acquitted on Count II. The court imposed a three and one-half year sentence on the drug-possession offense. Execution of the sentence was suspended, and Defendant was placed on probation for five years.

On appeal, Defendant contends that his conviction should be reversed for two reasons. First, he argues the trial court erred in overruling a motion to suppress evidence seized during a search of Defendant's truck because that evidence was discovered only after Defendant had been detained longer than necessary to complete a routine traffic stop. Second, he argues the trial court abused its discretion by admitting the crystal substance seized from his truck, as well as the opinion testimony and a laboratory report concerning this substance, because the State failed to establish a proper chain of custody. Finding no merit in either argument, we affirm.

*Point I—Motion to Suppress Evidence*

 Prior to trial, Defendant's attorney filed a motion to suppress all evidence seized during the search of Defendant's truck. The State bore the burden of proving by a preponderance of the evidence that Defendant's motion to suppress should be denied. *State v. Mack*, 66 S.W.3d 706, 708 (Mo. banc 2002); § 542.296.6. The trial court decided to hear the motion to suppress simultaneously with the State's case-in-chief. In a post-trial ruling, the court denied the motion.

 In Defendant's first point on appeal, he contends the court's ruling on the motion to suppress was in error because the evidence seized during the search of

---

**1.** All references to statutes are to RSMo (2000).

Defendant's truck was discovered only after Defendant had been detained past the time necessary for a reasonable investigation of a routine traffic stop and in the absence of specific or articulable facts to support an objectively reasonable suspicion of Defendant's involvement in further criminal activity. On appellate review, we view the evidence in a light most favorable to the court's ruling and disregard all contrary evidence and inferences. *State v. Williams*, 97 S.W.3d 462, 469 (Mo. banc 2003); *State v. Galazin*, 58 S.W.3d 500, 507 (Mo. banc 2001); *State v. Kinkead*, 983 S.W.2d 518, 519 (Mo. banc 1998). The facts set out below are recounted in accordance with this principle.

■ On July 19, 2003, Trooper Steven Jones (Jones) was on patrol in Lawrence County, Missouri. He was accompanied by Missouri Liquor Control Agent Nick Huckstep (Huckstep). Jones had made a high number of D.W.I. arrests and encountered other liquor violations in certain parts of the county, so Huckstep was riding along to assist in enforcement and follow-up.

At approximately 1:00 a.m., Jones and Huckstep were traveling westbound on Highway 60 near Marionville. As Jones approached the intersection of Highway 60 and Highway 265, a primer-gray truck pulled out from Highway 265 and entered the eastbound lane of Highway 60. As soon as the truck began facing toward Jones' patrol car, the driver suddenly made a sharp, right-hand turn off of Highway 60 without using his turn signal. The driver entered a parking lot where a gas station and a Dairy Queen were located. Neither business was open at the time, and there were no other cars on the lot. Moreover, the driver had just driven past another entrance into the same parking lot on Highway 265. The driver's actions were unusual and seemed to indicate an intention to avoid Jones' approaching patrol car by entering a private parking lot.

At 1:01 a.m., Jones activated his emergency lights and entered the parking lot.[2] Instead of stopping immediately, the truck continued to curve slowly to the right for a short time before coming to a complete stop. Jones found this behavior unusual and, based on his prior experiences with other motorists, he suspected the driver was hiding something inside the truck.

When Jones approached the truck, he noticed a strong, odd smell that could have been from an alcoholic beverage. The driver produced his license, which identified him as Defendant, and his vehicle registration and insurance card. When asked about his destination, Defendant replied that he was on his way home. Jones asked Defendant if he had been drinking, which he denied. When Jones inquired about the strong odor in the truck, Defendant said he had just recently put on cologne. In Jones' past experience, strong odors of cologne had been used to mask the scent of marijuana in an automobile.

At Jones' request, Defendant got out of his truck and sat down in the front passenger's seat in the patrol car. Huckstep stood outside of the car by the passenger door. Defendant was cooperative, but he appeared abnormally nervous. Defendant's eyes were watery and bloodshot. He looked straight ahead and avoided making eye contact with Jones when answering his questions. Jones administered

---

**2.** At this point, a videotape unit inside the patrol car was activated. A copy of this videotape, which contains a constant digital time display, was admitted into evidence at trial as Exhibit 1A. This exhibit has been viewed by this Court and has been used, along with Jones' testimony, to produce a synthesis of facts favorable to the trial court's ruling on the motion to suppress.

a portable breath test to Defendant, but the result was negative. At that point, Jones no longer suspected Defendant was intoxicated by alcohol or drugs. Thus far, the traffic stop had lasted about three and one-half minutes.

Jones requested a full check on Defendant and his vehicle registration from the Missouri State Highway Patrol (MSHP) dispatcher. Jones' decision whether to issue a warning instead of a citation would depend on what he learned from the dispatcher. While waiting on a response, Jones began filling out a racial profiling form. This is a required form which must be prepared after each traffic stop. Due to Defendant's watery and bloodshot eyes, the strong odor in the truck, his heightened nervousness and his apparent effort to avoid Jones by veering off the roadway into the empty parking lot of a closed business, Jones asked Defendant if he had any weapons, drugs, alcohol or illegal items in his truck. Defendant denied having anything illegal. When Jones asked for permission to search the truck, Defendant said there was nothing to find in there, and his attorney had told him not to let people search his car. At this point in the conversation, the dispatcher reported back that Defendant had several prior traffic offenses, including speeding and driving while suspended or revoked. The dispatcher also indicated that she had additional information to relay. By this time, the traffic stop had lasted approximately six and one-half minutes.

While waiting on the dispatcher, Jones and Defendant talked about the nature of the prior cases in which Defendant had been represented by an attorney and where that attorney was located. After the traffic stop had lasted approximately seven and one-half minutes, the dispatcher relayed the last bit of information about Defendant to Jones. Jones decided to issue Defendant a citation for failing to signal. Jones again asked Defendant for permission to search his vehicle. Defendant consented to the search. His consent was given approximately 30 seconds after the final transmission from the dispatcher, which occurred about eight minutes after Defendant had been stopped. He was still seated in Jones' patrol car and had not been given his traffic citation when he consented to the search.

During the search, Jones found a package of cigars concealed behind the driver's armrest in Defendant's truck. Inside of the package, Jones found three small plastic bags containing crystals. Two of the bags were inside another, larger plastic bag. Jones performed a field drug test, which was positive for methamphetamine. Defendant was then arrested. At no time prior to the discovery of the crystals in the truck had Defendant revoked his consent for the search.[3]

█ In reviewing a trial court's ruling on a motion to suppress, our inquiry is limited to determining whether the decision is supported by substantial evidence. *State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). We will not reverse the trial court's ruling unless the decision is clearly erroneous, leaving this Court with a definite and firm impression that a mistake has been made. *State v. Williams*, 97 S.W.3d 462, 469 (Mo. banc 2003); *State v. Birmingham*, 132 S.W.3d 318, 321 (Mo. App.2004). Furthermore, we must defer to the trial court's factual findings and credibility determinations. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

---

**3.** During a more thorough search of the truck following Defendant's arrest, Jones also found a cane sword in the truck bed. Since Defendant was acquitted on the weapons charge, further discussion of this aspect of the search is unnecessary.

For this reason, "[t]he trial court may not be reversed if its decision is plausible, even if we are convinced that we would have weighed the evidence differently if sitting as the trier of fact." *State v. Davalos*, 128 S.W.3d 143, 147 (Mo.App.2004).

The Fourth Amendment to the United States Constitution guarantees all citizens the right to be free from unreasonable searches and seizures. *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). "A routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment." *State v. Barks*, 128 S.W.3d 513, 516 (Mo. banc 2004). The period of detention, however, "may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation." *Granado*, 148 S.W.3d at 311. "Once the investigation of a traffic stop is concluded, the detainee must be allowed to proceed unless specific, articulable facts create an objectively reasonable suspicion that the individual is involved in criminal activity." *State v. Dickerson*, 172 S.W.3d 818, 820 (Mo.App.2005).

As noted above, Defendant contends the evidence seized from his truck was discovered only after Defendant had been detained past the time necessary for a reasonable investigation of a routine traffic stop and in the absence of specific or articulable facts to support an objectively reasonable suspicion of Defendant's involvement in further criminal activity.

We find Defendant's argument untenable because he consented to the search of his truck before the traffic stop concluded. A reasonable investigation of a stop for a traffic violation may include the following steps: (1) asking for the driver's license, registration and proof of insurance; (2) requesting that the driver sit in the patrol car; (3) questioning the driver about his purpose and destination; (4) run-

ning a computer check on the driver and his vehicle; and (5) issuing a warning or citation. *See Granado*, 148 S.W.3d at 311; *Davalos*, 128 S.W.3d at 147; *State v. Hoyt*, 75 S.W.3d 879, 883 (Mo.App.2002); *State v. Riddle*, 843 S.W.2d 385, 387 (Mo.App. 1992). "As long as the officer is investigating these items, running the records check, and issuing a citation, the officer may continue to conduct a reasonable investigation of the traffic violation by conversing with the driver." *State v. Maginnis*, 150 S.W.3d 117, 120 (Mo.App.2004). Thus, a routine traffic stop is not concluded until the warning or citation is issued. *See Granado*, 148 S.W.3d at 311; *State v. Barks*, 128 S.W.3d 513, 517 (Mo. banc 2004); *Davalos*, 128 S.W.3d at 147; *Hoyt*, 75 S.W.3d at 883. That had not yet occurred when Defendant consented to the search of his vehicle.

*State v. Watkins*, 73 S.W.3d 881 (Mo. App.2002), is directly on point. Watkins was stopped for crossing the roadway's center line. He gave his driver's license to the trooper and accompanied him to the patrol car. While the trooper was running a records check and preparing the citation, he conversed with Watkins. The trooper noticed that Watkins was very nervous, stammered and wouldn't make eye contact. The trooper asked Watkins whether he possessed anything illegal, which he denied. When the trooper asked for permission to search Watkins' vehicle, he consented. During the search, a small bag of methamphetamine was found in Watkins' car. The trial court sustained Watkins' motion to suppress the drug evidence because the traffic stop terminated when Watkins denied having contraband. *Id.* at 882–83. That ruling, however, was reversed on appeal because the traffic stop had not terminated when Watkins consented to the search:

There simply is insufficient evidence that the records check and the investiga-

tion of the traffic violation was complete or that the investigatory stop had terminated at the time the trooper requested the search. For example, there is no evidence to show that the records check had been completed, that the trooper had received information back from dispatch, or that the trooper had processed and issued the citation. Nor is there evidence that the trooper had returned defendant's license and citation to him, or that defendant was told he could go back to his car. Rather, based on the evidence before us, the testimony indicates that the trooper was running a records check during his conversation with the defendant in which he asked for consent to search. As the record check was ongoing, the investigation of the traffic violation had yet to conclude and thus, the investigatory stop had not concluded when the search was requested and consent was given.

*Id.* at 884 (citations omitted). We reach the same conclusion in the case at bar. When Defendant consented to the search of his truck, Jones had only received the final transmission from the dispatcher about 30 seconds earlier. Jones had decided to issue a citation to Defendant, but he had not yet finished filling out the ticket. Therefore, the traffic stop had not terminated before consent to search was given.[4] Defendant's first point is denied.

### Point II—Chain of Custody for the State's Drug Evidence

In Defendant's second point on appeal, he contends the trial court erred in admit-

ting Exhibit 2A and the testimony of criminalist Scott Workman (Workman) concerning the results of his analysis of the substance contained within this exhibit. The premise of Defendant's argument is that Exhibit 2A—a metal container holding three plastic bags of crystals and one larger, empty plastic bag—was not properly identified because the State's evidence concerning the chain-of-custody evidence was inadequate. The evidence bearing on this issue came from Jones, Sergeant Timothy Selvey (Selvey) and Workman. Their testimony is summarized below.

During the search of Defendant's vehicle on July 19th, Jones found three bags containing a crystal substance inside a package of Swisher Sweets cigars. The package, which had been concealed behind the armrest of Defendant's truck, held one inch-long bag containing crystals and two more similar bags that had been placed into another larger plastic bag. Jones removed the bags from the cigar package and photographed all four bags lying on the driver's seat of the truck. Jones placed the bags into a metal container, which he labeled with Defendant's name, the date and the time the evidence was seized. Jones put the labeled container into an evidence envelope, sealed the envelope with red evidence tape and wrote his initials such that one part of each letter appeared on the tape and the other part of the letter appeared on the envelope. The red evidence tape sealed the only opening in the envelope. Jones placed the sealed evidence envelope in the Troop D evidence

---

4. *State v. Slavin*, 944 S.W.2d 314 (Mo.App. 1997), upon which Defendant relies, is distinguishable for this reason. In *Slavin*, the traffic stop lasted only eight minutes and ended when the trooper gave Slavin a written warning. *Id.* at 318. After the traffic stop was over, the trooper asked to search Slavin's vehicle. When he refused, the trooper de-

tained Slavin's car for an additional 52 minutes until a canine unit arrived. *Id.* at 316. The western district of this Court held that the trooper did not obtain sufficient facts during the traffic stop to develop a reasonable suspicion that Slavin was involved in other criminal activity so as to justify the continued detention and search of his vehicle. *Id.* at 318.

drop box at 2:30 a.m. on July 21st. He also left a written request form asking for laboratory testing of the crystals.

Selvey was the officer in charge of evidence at the MSHP Troop D headquarters in Springfield, Missouri. He handled all of the evidence collected by officers in Troop D's area of operations, which was placed into the evidence locker. The only persons with access to the evidence locker were Selvey, his supervisor and two backup evidence officers who could access the locker only if Selvey was absent. At 8:00 a.m. on July 21, 2003, Selvey removed the evidence envelope Jones had left in the drop box a few hours earlier. Selvey signed the envelope and noted the day and time he received it. He entered the envelope into the computer system, gave it the identification number of 03–801 and assigned it to a specific storage location in the evidence room. He then took envelope 03–801 to the MSHP crime lab in Springfield, Missouri, as Jones had requested. Selvey delivered it at 2:10 p.m. on July 21st and received a receipt from the lab. Evidence delivered to the crime lab was routinely kept in a locked evidence locker pending analysis by a criminalist. The common practice at the lab was for the criminalist to note the date when a package submitted for testing was opened. After analysis, the package would be resealed, and returned to the lab's evidence locker, where the evidence would remain pending its return to the submitting agency.

Selvey picked up envelope 03–801 from the crime lab on October 17, 2003. The envelope had been opened on September 18, 2003 and resealed with blue crime lab tape. The initials M.D.B. had been written on the blue crime lab tape in such a fashion as to be partially on the tape and partially on the envelope. The envelope also contained crime lab identification number DL023691. Selvey took the envel-ope back to the MSHP's evidence locker and placed it on its assigned shelf.

Envelope 03–801 remained in the evidence locker until it was returned to the crime lab for retesting on April 4, 2005. Selvey picked the envelope up from the crime lab on April 28, 2005. At that time, the envelope had a second piece of blue crime lab tape on it. The tape and envelope were signed, using the same method described above, with the initials M.S.W. The date on the envelope indicated that it had been opened and resealed on April 12, 2005, and it also bore another crime lab identification number: DL023691A1. Envelope 03–801 was always sealed when it was taken to and from the crime lab by Selvey. He brought both envelope 03–801 and the cane sword found in Defendant's truck to court on April 29, 2005.

At trial, envelope 03–801 was admitted into evidence as State's Exhibit 2. Jones identified the envelope as the one he placed in the Troop D drop box on July 21, 2003. There was another opening in the envelope which had been closed with blue tape and other markings which Jones recognized as those used by the MSHP crime lab. Jones used a knife to cut through the red tape he had applied and opened Exhibit 2 in court. He then identified the labeled metal container, which was admitted into evidence as Exhibit 2A, as the same one he placed into the evidence envelope on July 19, 2003. This container also contained the initials M.D.B. Jones recognized these initials, which had been placed on the container after it left Jones' possession, as those of MSHP criminalist Mathew Barb (Barb). Jones opened Exhibit 2A and removed four plastic bags. Three of the bags contained a crystal substance. The remaining plastic bag was empty and larger than the other three. Jones testified that the four bags inside the metal container were similar in size and appear-

ance to those he seized from Defendant's truck on July 19, 2003. The photograph Jones took of the bags he found in Defendant's truck on that date was admitted in evidence as Exhibit 7. After the bags left Jones' possession, all four had been numbered and initialed by two different persons: M.D.B. and M.S.W.

Workman was a criminalist employed by the MSHP. He was asked to retest the crystals found in Defendant's truck. He did such retests in three different cases involving criminalist Barb. Workman obtained envelope 03–801 from the lab's evidence locker. He placed his initials, lab identification number DL023691A1 and the date of April 12, 2005 on the envelope. To conduct the retest, Workman cut a slit in the envelope and removed the metal container. The label on the container bore Defendant's name; the date of July 19, 2003; crime lab no. DL023691; Barb's initials; and the date of September 18, 2003. Workman remarked this container with his initials, the number DL023691A1 and the date. Once he opened it, he found three plastic bags containing a crystal substance and an empty plastic bag inside.

According to the markings on the three crystal-containing bags, Barb had opened the bags on September 18, 2003; individually labeled the smaller bags as specimens 1A1, 1A2 and 1A3, and the larger, empty bag as 1B; tested the contents and resealed the bags with blue crime lab tape that he dated and initialed. Workman remarked the smaller bags as specimens 1A1, 1A2, and 1A3, the same specimen numbers as were documented by Barb. He opened each bag, weighed the contents and tested the substance inside using a preliminary screening test and a confirmatory gas chromatography mass spectrometry test.[5] He then resealed each bag with blue crime lab tape. He wrote his initials,

lab identification number DL023691A1 and the date of April 12, 2005 on the tape. Once the retesting was concluded, Workman placed the four plastic bags back into the metal container. He placed that container inside envelope 03–801 and resealed it with blue crime lab tape. He wrote the initials M.S.W. across the tape/envelope and put the date of resealing (April 12, 2005) on the tape. This was the required procedure that MSHP criminalists were taught to follow.

At trial, Workman was shown Exhibit 2. He recognized this exhibit as evidence envelope 03–801, which contained the substances he had been asked to retest. Upon examining Exhibit 2, he was able to identify the initials of Teresa Wallace (Wallace) beside the date of October 17, 2003. Wallace worked at the crime lab as a laboratory records and evidence control clerk. It was her job to handle evidence received and returned by the lab. Workman also identified Exhibit 4 as his report of April 19, 2005 containing the results of his analysis. When Exhibit 4 was offered, Defendant's counsel objected on the ground that the State's proof of chain of custody was insufficient. The court overruled the objection and admitted the report in evidence. Workman testified that the crystal substance contained in the specimen bags 1A1, 1A2 and 1A3 was methamphetamine. Each of these specimen bags had been removed by Workman from the metal container separately identified as Exhibit 2A. Exhibit 2A, in turn, had been removed by Workman from Exhibit 2 and returned there after retesting was completed.

The determination of whether a sufficient chain of custody has been established for admission of an exhibit is a matter within the sound discretion of the

---

**5.** The combined weight of the crystals from all three bags was .69 grams.

trial court. *State v. Link*, 25 S.W.3d 136, 146 (Mo. banc 2000). A trial court will be found to have abused its discretion only when a ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration[.]" *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997); *State v. Mathews*, 33 S.W.3d 658, 660 (Mo.App.2000).

 Missouri law requires the State to provide a "reasonable assurance" that the exhibit sought to be introduced is received from the defendant and is in like condition at the time of introduction as when received. *State v. Sammons*, 93 S.W.3d 808, 810 (Mo.App.2002). "However, it does not require proof of hand-to-hand custody, a showing that the exhibit was continually watched, or proof of the exclusion of every possibility that the evidence has been disturbed." *Id.; State v. Anthony*, 857 S.W.2d 861, 865 (Mo.App. 1993). The trial court may assume, absent a showing of bad faith or ill will, that the officials charged with custody of the evidence properly discharged their duties and did not tamper with the evidence. *Link*, 25 S.W.3d at 146. "The trial court is in the best position to evaluate whether an exhibit has been improperly tampered with or contaminated." *State v. Smith*, 979 S.W.2d 215, 221 (Mo.App.1998).

 In Defendant's second point on appeal, he contends the trial court abused its discretion in admitting Exhibit 2A and Workman's testimony and report concerning his analysis of the contents of this exhibit because the State failed to show where Exhibit 2A was between July 21, 2003 and April 4, 2005. We find no merit in this contention.

The State did not have the obligation to prove that Exhibit 2A was "continually watched" between July 21, 2003 and April 4, 2005. *Sammons*, 93 S.W.3d at 810; *Anthony*, 857 S.W.2d at 865. Instead, there simply needed to be sufficient evidence to provide the trial court with a reasonable assurance that Exhibit 2A had not been tampered with or contaminated and was in the same condition when tested as when it was seized from the Defendant's truck. The State met that burden in the case at bar.

The State's evidence was sufficient for the court to draw the following conclusions concerning the chain of custody for Exhibit 2:

1. The three bags of crystals and another empty plastic bag were placed in Exhibit 2A by Jones and sealed inside Exhibit 2.

2. Selvey retrieved Exhibit 2 from a secure MSHP drop box on July 21, 2003. After Exhibit 2 was numbered, entered into the computer system and assigned a storage location, Selvey took Exhibit 2 to the crime lab.

3. Per standard procedure there, Exhibit 2 would have been stored in a locked storage container until it was removed by Barb for testing on September 18, 2003.

4. The markings on Exhibits 2 and 2A indicate that they were opened by Barb for testing purposes on that date. All three bags of crystals and the empty plastic bag were marked by Barb. The bags containing crystals were opened for testing and resealed on September 18th. All four bags were placed back inside Exhibit 2A, which in turn was placed back inside Exhibit 2. The envelope was returned to the crime lab's locked storage unit.

5. On October 17, 2003, lab clerk Wallace retrieved Exhibit 2 from the crime lab's locked storage unit and returned the envelope to Selvey.

Up to that point in time, Barb had been the only person to open that sealed envelope.

6. Selvey placed Exhibit 2 back in the MSHP's evidence storage locker. The only persons with access to that locker were Selvey and three other officers.

7. Exhibit 2 remained there until Selvey took the envelope back to the crime lab for testing on April 4, 2005.

Thus, there was sufficient evidence before the court for it to be reasonably assured that: (1) Exhibit 2 had been securely stored between July 21, 2003 and April 4, 2005; (2) the exhibit had not been tampered with or contaminated; and (3) the substances inside Exhibit 2A were in the same condition as when they were seized from Defendant's truck. That being the case, the court committed no error in admitting Exhibit 2A. Because this exhibit was properly admitted, the court also committed no error in admitting Workman's testimony and lab report concerning the results of the tests he performed on the crystal substances inside Exhibit 2A.

Defendant argues, however, that the chain of custody was deficient because Selvey was unable to produce at trial the receipt he received from the crime lab when he picked up Exhibit 2 the first time. We disagree. Selvey testified that he personally picked up Exhibit 2 from the crime lab. The evidence envelope was sealed when he received it. He acknowledged being given a receipt from the lab at that time, but he did not produce it at trial. Nevertheless, Selvey gave the following testimony during his direct examination concerning the markings on the exterior of Exhibit 2:

Q: And the—the numbers below that, do you know what the other numbers—That looks like one, seven, October '03.

A: That appears October 17th of 2003. And I can't make out those initials. That could be the secretary that—that handled the evidence to return it to me at the time I picked it up. And I don't—I'm just not sure.

Since Workman later identified those initials as belonging to crime lab evidence control clerk Wallace, the October 17th date mark and Wallace's initials on Exhibit 2 were sufficient to support the conclusion that Selvey retrieved Exhibit 2 from Wallace at the crime lab on that date. Once Selvey regained possession of Exhibit 2, he returned it to its assigned location in the MSHP's evidence locker. It remained there until it was returned to the crime lab for retesting by Workman on April 4, 2005. "The court may assume, in the absence of evidence to the contrary, that the officials charged with custody of the evidence properly discharged their duties and did not tamper with the evidence." *State v. Smith,* 979 S.W.2d 215, 222 (Mo.App.1998); *see State v. Link,* 25 S.W.3d 136, 146 (Mo. banc 2000). In addition, the detailed testimony from Jones, Selvey and Workman concerning the handling, marking and storage of Exhibits 2 and 2A provided further reasonable assurance to the trial court that the crystals inside the metal container were in the same condition when tested by Workman as they were when initially seized from Defendant's truck.

Defendant's reliance on *State v. Weber,* 768 S.W.2d 645 (Mo.App.1989), is misplaced. There, law enforcement officers Kent, Bailey and Stevens went to a residence to serve a search warrant on September 23, 1986. Stevens was assigned to take charge of any articles seized during the search. Those items included two bags of green plant material and two plastic bags of powder. At the trial, the four bags were identified as Exhibits 10, 15, 16 and 27. Stevens identified these exhibits as items seized during the search. Bailey

testified that he received the four bags from Kent approximately seven days after the search was conducted and took them to a Jefferson City crime lab for testing. *Id.* at 647. The chain-of-custody evidence was deficient because "[t]here is nothing in the record to indicate when Kent came into possession of the exhibits, or where they had been in the interim between September 23, 1986, when they were seized, and September 30, 1986, when they were taken to Jefferson City." *Id.* This gap in the chain of custody rendered the chemical analysis of the bags' contents inadmissible due to lack of proper foundation. *Id.* at 648.

*Weber* is distinguishable because there is no such gap in the chain of custody here. The three bags of crystals that Jones seized from Defendant's truck were placed into an evidence envelope at the scene, and Jones personally sealed and labeled the envelope. It remained in his possession until he placed the sealed envelope in a secure drop box at MSHP headquarters on July 21, 2003. Selvey retrieved the envelope from the drop box a few hours later, and we have already determined that the chain of custody relating to transfers of that sealed envelope between Selvey and the crime lab was sufficient. Accordingly, *Weber* does not support Defendant's argument.

We conclude that the trial court did not abuse its discretion in admitting Exhibit 2A, Exhibit 4 or Workman's testimony concerning the results of his lab tests. Defendant's second point on appeal is denied, and the judgment of the trial court is affirmed.

SHRUM, Sr.J., and BARNEY, J., concur.