**STATE of Missouri, Respondent,**

v.

**Jack Lee HAMILTON, Appellant.**

**No. WD 37787.**

Missouri Court of Appeals,
Western District.

Sept. 8, 1987.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Oct. 27, 1987.

Application to Transfer Denied
Dec. 15, 1987.

Sean O'Brien, Public Defender, Bruce R. Anderson, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and SHANGLER and BERREY, JJ.

PRITCHARD, Presiding Judge.

By the verdict of a jury appellant was found guilty of the Class A felony of Robbery in the First Degree under Count I, and also of Armed Criminal Action under Count II. As a persistent offender, he was sentenced to consecutive terms of life and 30 years imprisonment on each count respectively. No question is presented as to the submissibility of the state's case.

In Point I, appellant contends that the trial court erred in sustaining the state's objection to his opening statement in which his counsel attempted to outline evidence favorable to him as it would be developed

through cross-examination of the state's witnesses. It is said that the ruling deprived appellant of rights guaranteed to him under the Sixth and Fourteenth Amendments to the U.S. Constitution; Article I, §§ 2, 10 and 18(a) of the Mo. Constitution; § 546.070, RSMo.1978; and Rule 27.02(d), in that the trial court denied appellant, who had not endorsed any witnesses, an opportunity to make an opening statement.

The state's case against appellant, who was never identified by the victims, the Nicholsons, depended on the testimony of two witnesses. In opening statement the prosecutor told the jury that it would hear from Rosemary Davis who had dated appellant for some period of time. On Friday evening, September 21 (1984), shortly before dusk, he came to her house and later left and was gone for several hours, returning after dark after he committed the crime. He told her what he had done, bragging that he had robbed a house in the area, and told her about the crime in detail. The police found that the unusual type of silverware had been sold the day after at a pawn shop in Kansas, and they found out who sold it.

The prosecutor also told the jury that it would hear from Sharon Murphy, whom he discussed during voir dire [as to whether any venireperson would bear a prejudice or bias against the testimony by reason of her not being charged in Kansas in exchange for her testimony at this trial, she being involved in the crime. This procedure is permissible under *State v. Roseman*, 583 S.W.2d 232, 234 (Mo.App.1979)]. The prosecutor stated that Sharon, a sister of Rosemary Davis, was working at the Silver Leaf Tavern in Kansas City, when about the noon hour appellant, whom she knew, called her and asked her if she wanted to make some money, he had some stuff for her to sell. Appellant then drove Sharon to a pawn shop in Kansas and had her go in and sell the silverware. On the way back from that pawn shop, Sharon began asking him questions about where the silverware came from, and he told her in detail about the crime—going into the victims' house on Woodson Road, just several blocks from

the house of Rosemary Davis, tied up the husband and directed the wife to produce all the property he wanted.

Counsel for appellant proceeded with his opening statement: " * * * There are, of course, two sides to every story. You heard the State's version of what happened on September the 21st, 1985. I now have the opportunity to tell you what evidence the defense will show. We will prove that Jack Hamilton is not guilty of this crime. No one argues the terrible series of events that happened on September 21st to Mr. and Mrs. Larry Nicholson. There's no doubt that that happened. It is unfortunate. But that does not make Mr. Jack Hamilton responsible. The two alleged witnesses that supposedly link Jack Hamilton to this offense that Mr. Gepford mentioned, the first one, Sharon Murphy. Sharon Murphy, as Mr. Gepford mentioned, was caught stealing—MR. GEPFORD: Objection, Your Honor. Mr. Berrigan is jumping the gun on closing argument. At this time he's supposed to tell the jury his evidence. This is the time for opening statement and not closing argument. He's arguing the credibility of the State's witnesses who haven't even testified yet. MR. BERRIGAN: I'm not arguing anything. I expect to prove this in cross-examination of Sharon Murphy. MR. GEPFORD: That's improper subject for opening statement, Your Honor. It's argumentative. THE COURT: I'll sustain the objection. Limit your opening statement to what you expect the evidence to be."

During a long colloquy before the court, appellant's counsel stated: "Your Honor, the Court's ruling puts me in a position of not being able to make an opening statement unless I produce witnesses on this offense. That's the effect of the court's ruling. The defense has no obligation whatsoever to produce any witnesses and I fail to see that informing the jury about the facts which we intend to be proven not only through cross-examination of the State's witnesses but through depositions already taken in this case, these are facts that the defense is entitled to have shown and they're entitled to be shown during

opening statement irregardless (sic) of whether or not that witness happens to be endorsed as a state's witness." Thereafter, the trial court, reaffirmed its previous ruling sustaining the state's objection to the above referenced position of appellant's opening statement upon the ground that it went to the credibility of the state's witness and was argumentative.

During direct examination of Rosemary Davis it was brought out by the state substantially what it had told the jury on opening statement, but additionally when she first talked to the police she told them she knew nothing about the crime because she was scared and had been raised to keep her mouth shut. Later she talked to the police again and told them what she knew about the crime. On cross-examination, appellant brought out that Rosemary had been dating him for about 6 months in 1984, but it was not a serious relationship. It was also brought out that she told the police, on October 19, 1984, that she had sold some stolen property in Kansas, but she did not get it from Jack Hamilton, and that an unknown suspect had given it to her. She is a sister of Sharon Murphy, who had been arrested by that date. She knew that Sharon was pregnant at that time with triplets by one Dennis Coxe; that she was on probation; and that there was at least one case pending against her in Kansas and another one which had not been filed. She knew that if Sharon had gone to trial on the cases, and been found guilty she could have ended up in the Kansas State Penitentiary for a good many years, and if her probation were revoked in Jackson County, Missouri, the triplets would have been born in jail there. On another later occasion, the police told Rosemary that if she did not cooperate with them it could result in her child being taken away from her by the Division of Family Services, she having had a similar experience in the past. One detective told her, as well, that she could be charged with this offense in Kansas, but she was not so charged, and her sister never ended up going to jail, and her probation was not violated that Rosemary knew of.

On direct examination Sharon Murphy testified that appellant phoned her at the Silver Leaf Tavern where she was a barmaid shortly after September 21, 1984, and asked her if she would like to make some money. Later, he picked her up and they went to her sister's house and picked up a silver set, and they took it to Precious Metals on Metcalf (in Kansas) and she sold it for $150 or $160. Later, appellant told her how he committed the robbery—tied up the man with tape and had the woman show him where the property was. He loaded it in their car and drove it down to his car where something spooked him and all he had gotten was the silver set and $600. Sharon was charged with felony theft by the Kansas authorities, but an agreement was made with the prosecutor in Kansas that if she testified truthfully in this case the Kansas case would be dismissed and she would not be charged with having sold the silver. The Kansas case was in fact dismissed. Sharon also admitted having been convicted of the misdemeanor of stealing under $150, for which she was given probation from March, 1983, to March, 1985, when she was discharged.

Appellant's counsel extensively cross-examined Sharon about these events. She admitted that it was a condition of her probation that she not commit any crimes, and it was also a condition that she report any arrests within 48 hours. She did not report either matter to Judge Romano, or to her probation officer, and she was asked if she was aware that if Judge Romano knew about them, her probation could have been revoked and she could have spent a year in the county jail. She testified that she did not know that, but she was aware that she could have been found guilty in Kansas and ended up in the penitentiary in that case. She was asked if she was able to have her babies (the triplets) and never go to jail or the penitentiary, but stated that was not the reason she came to testify against appellant, and that she was told that if she willingly came to truthfully testify in this case, the (Kansas) charges would be dropped. It is not exactly clear, but apparently there were two felony charges in Kansas.

At the close of the state's case appellant testified that he chose not to testify and not to call any witnesses in his behalf. Appellant's counsel fully argued the believability of the two witnesses against him, Rosemary Davis and Sharon Murphy.

It has long been the rule that the primary purpose or function of an opening statement is "to inform the court and the jury in a general way of the nature of the case, the outline of the anticipated proof and the significance of the evidence as it is presented. *State v. Fleming*, 523 S.W.2d 849, 852[1] (Mo.App.1975). In that case the appellant attempted to state his "theory" of the case meaning an "interpretation based solely upon the facts presented by the State." It was held that the trial court did not err in limiting appellant to the evidence he expected to produce. *See also* there cited and quoted Standard 7.4, p. 267, of the American Bar Standards for Criminal Justice. In *State v. Ivory*, 609 S.W.2d 217, 221[6] (Mo.App.1980), the defendant complained that the trial court erred in limiting his opening statement to evidence that would be adduced by him rather than commenting on evidence that he anticipated would be produced in the State's case. The court found that the content of defendant's proffered statement, which in most part set out and interpreted what he anticipated the State's evidence would show and comments with respect to the effect of that evidence could best be characterized as argument, which is not a proper function of an opening statement. The court also said, p. 222 [7, 8], that the control of the opening statement is within the sound discretion of the trial court. In *State v. Hurst*, 612 S.W.2d 846, 853 [14, 15] (Mo.App.1981), it was held that there was no error in limiting defendant's opening statement as to what the evidence would show, particularly in the area of credibility of the state's witnesses. In *State v. Brooks*, 618 S.W.2d 22, 24 [3–5] (Mo. banc 1981), the court observed that the scope and manner of opening statement is largely within the discretion of the court as to the good faith of counsel in making opening statements to the jury as to material facts they intend to prove. The defendant there, moved to strike the prosecutor's statement about an informants observations of narcotics being sold as inadmissible hearsay, but it was held that it was arguably admissible to explain an officer's surveillance of a house. In *State v. Bibbs*, 634 S.W.2d 499, 501 (Mo.App.1982), the court found no error in the trial court's sustaining a state objection to an opening statement which began to outline evidence which would be developed on cross-examination of the state's witnesses, it going to their credibility. For the same ruling *see State v. Gibson*, 684 S.W.2d 413, 415 [2, 3] (Mo.App.1984). These foregoing cases were incorporated in this court's opinion in *State v. Harris*, 731 S.W.2d 846 (Mo.App. 1987). In that case in opening statement defendant contrasted what the state's evidence would be with what his own would be. The trial court sustained the state's objection that the defendant's opening statement constituted an improper comment on evidence he hoped to develop through cross-examination of the state's witnesses. The objection did not come until defendant had made his point on contrasting evidence, a full statement thereof, hence no error or abuse of the trial court's discretion was found. Furthermore, defendant did not tell this court that the trial court's ruling prevented his counsel from adding to the opening statement.

█ Clearly, in this case the defendant's proffered opening statement, as revealed by the lengthy colloquy before the court, was what he would develop on cross-examination of the state's two witnesses, a matter of argument at that stage of the trial, which is prohibited by the foregoing cases. It transcends the purpose of the opening statements which is to inform the court and jury what each party expects to prove by introduction of evidence in support of the charge or defense. Although where a defendant will not testify and has no other evidence or testimony there may be no basis for an opening statement on his part, the ruling does not prevent the statement of what he expects to prove as a defense *if* he will have evidence. Point I, under the posture of this case, is overruled.

In Point II appellant claims error in the court's sustaining the state's motion in limine which permitted only a conditional cross-examination of Sharon Murphy—that if appellant brought out that she incriminated appellant to protect Dennis Coxe (her boyfriend and father of her triplets), who was the first suspect to be investigated by the police, the state would be entitled to show that Coxe, under surveillance, was seen with appellant a number of times proceeding through neighborhoods in a suspicious manner. It is argued that the surveillance occurred after the robbery and the state knew of the contact between Sharon and appellant prior to the surveillance; appellant was not linked to the robbery by virtue of the surveilance; and the surveilance was essentially irrelevant and prejudicial evidence which suggested misconduct unrelated to the robbery. As a consequence of the trial court's ruling, appellant chose not to cross-examine Sharon as to her bias in favor of Coxe and against appellant; her knowledge that Coxe was on probation and was a suspect in the robbery; and that she incriminated appellant solely because of her relationship with Coxe.

■ Although it would be error not to allow cross-examination of a witness to show bias favoring another person, as by protecting him, State v. McClure, 504 S.W. 2d 664, 669 (Mo.App.1974); State v. Neal, 526 S.W.2d 898, 901 [1–4] (Mo.App.1975), the trial court did not rule that appellant would be prevented from cross-examining Sharon with respect to Coxe. It ruled only that if appellant did so cross-examine Sharon, the state could then show the full facts of surveillance, thus permitting the jury to know the whole story. It was appellant's choice not to go into the relationship between Sharon and Coxe. Nothing was therefore placed before the jury as to appellant's being present with Coxe during the surveillance, which possibly could then be considered as error because of irrelevancy and suggesting misconduct unrelated to the robbery. Point II is overruled.

■ By Point III appellant claims the trial court committed error in failing to sustain his motion to quash the jury selected in this case because the state "systematically" used its peremptory challenges to remove the only three black persons among the venire following voir dire and challenges for cause. In his point appellant contends that such "systematic" exclusion denied him "a fair cross-section of the community on his jury and denied him due process of the right to jury trial under the *Missouri* and United States Constitutions." (Emphasis added.) Appellant here is white; the venire persons struck were black. He relies on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). That case holds at 106 S.Ct. 1722–23[4], "[T]hat a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida,* supra, 430 U.S. [482] at 494, 97 S.Ct. [1272] at 1280 [51 L.Ed.2d 498], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Consequently, appellant may make no valid claim that he was denied equal protection of the law under the *Batson* decision simply because he is white, and the venirepersons who were peremptorily stricken were black.

In his oral motion to the trial court after the peremptory challenges were made to quash the jury panel. counsel for appellant stated as reasons: "That the panel does not constitute a jury of defendant's peers. It does not constitute a fair and impartial jury because the State, in the exercise of its peremptory challenges, struck the only three people who were qualified to serve as jurors in this case [they being three black persons]." In his motion for new trial, appellant alleged: "This systematic exclusion of blacks from jury service through the use of peremptory challenges violated the defendant's Sixth Amendment right to a fair and impartial jury drawn from a cross-section of the community as well as

the Fourteenth Amendment's guarantee of equal protection of the laws."

Const.Mo. Art. I, § 22(a) (1945), provides: "That the right to trial by jury shall remain inviolate; provided that a jury for the trial of criminal and civil cases in courts not of record may consist of less than twelve citizens as may be prescribed by law, * * *." Const.Mo. Art. I, § 18(a) (1945), provides: "That in criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel; * * * and [to have] a speedy public trial by an impartial jury of the county." It is apparent that appellant did not raise in the trial court "at first opportunity" any violation of his right to public trial by an impartial jury under either provision of the Missouri Constitution so as to preserve the issue for review under these representative cases from other jurisdictions which have applied their state constitutional provisions relating to trial by a fair and impartial jury as a counterpart of Const.U.S.Amend. VI: *People v. Wheeler*, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978) [where the defendants were black and every black on the jury was peremptorily stricken resulting in a conviction by an all white jury, the case being decided before *Batson, supra*.]; *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499 (1979) [also cited before *Batson, supra*]; *State v. Gilmore*, 103 N.J. 508, 511 A.2d 1150 (1986); and *State v. Neil*, 457 So.2d 481 (Fla.1984). These cases seem not to foreclose an inquiry by the trial court, at that stage of the proceedings, as to the existence of a neutral basis for exercising peremptory challenges.

The judgment is affirmed.

All concur.