STATE of Missouri, Respondent,

v.

Bruce D. THOMPSON, Appellant.

No. SC 83875.

Supreme Court of Missouri,
En Banc.

Feb. 26, 2002.

———————

Rosemary E. Percival, Asst. Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for Respondent.

DUANE BENTON, Judge.

Bruce D. Thompson was convicted by a jury of second-degree murder and armed criminal action. He was sentenced to life imprisonment and 15 years, respectively. He argues that the circuit court erred in limiting his opening statement to evidence to be produced in his case-in-chief, excluding evidence to be elicited by cross-examining State witnesses. After opinion by the Court of Appeals, this Court granted transfer. *Mo. Const. art. V, sec. 10.* Reversed and remanded.

## I.

 The State moved in limine to limit defendant's opening statement to the evidence in his case-in-chief. The defense objected, asserting its intent to elicit exculpatory evidence from State witnesses. Defense counsel argued that because she would not present such evidence in her case-in-chief, she could not give a meaningful opening statement. The court sustained the State's motion.

After the State's opening statement, the defense again requested to make an opening statement incorporating the matters discussed in the motion in limine. The trial court denied the request. Defense counsel then delivered this opening statement:

There's much more; there's much more. We ask you to wait, listen, and then decide. The evidence will not add up, so you will not be able to find Bruce Thompson guilty of this offense because he is not.

The state objected, and the court sustained the objection.

## II.

 The primary purpose of an opening statement is to inform the judge and jury of the general nature of the case, so they may appreciate the significance of the evidence as it is presented. *Best v. District of Columbia*, 291 U.S. 411, 415, 54 S.Ct. 487, 489, 78 L.Ed. 882, 885 (1934); *Hays v. Missouri Pac. R.R. Co.*, 304 S.W.2d 800, 804 (Mo.1957). Opening statements are limited to factual statements that can be proved. *State v. Feger*, 340 S.W.2d 716, 724 (Mo.1960); *State v. Fleming*, 523 S.W.2d 849, 853 (Mo.App.1975). Thus, argument is improper. *State v. Arrington*, 375 S.W.2d 186, 190 (Mo.1964); *State v. Hurst*, 612 S.W.2d 846, 853 (Mo. App.1981); *State v. Ivory*, 609 S.W.2d 217, 222 (Mo.App.1980).

 Cross-examination may establish facts. State witnesses may know facts that support the defense, because the State, like any party, must take its witnesses as it finds them. *Rowe v. Farmers Ins. Co.*, 699 S.W.2d 423, 424–25 (Mo. banc 1985). Generally, State witnesses may be cross-examined on any and all matters in the case, including matters not within the scope of direct examination. *State v. Gardner*, 8 S.W.3d 66, 71 (Mo. banc 1999). Even cross-examination limited to prior inconsistent statements may yield substantive evidence. See *Section 491.074 RSMo 1994*. Thus, through cross-examination alone, the defense can establish facts, a defense, or theory of the case.

■ An absolute ban on reference to *all* cross-examination testimony denies the defendant—who does not call witnesses—the right to an opening statement. See *Rule 27.02(f); section 546.070(2) RSMo 1994.* Such a ban reaches beyond the prohibition of argument in opening statements. Cases espousing this absolute ban are hereby overruled. *State v. Flaaen,* 863 S.W.2d 658, 661 (Mo.App.1993); *State v. Nelson,* 831 S.W.2d 665, 667 (Mo.App.1992); *State v. Gibson,* 684 S.W.2d 413, 415 (Mo.App. 1984); *State v. Bibbs,* 634 S.W.2d 499, 501 (Mo.App.1982). See also *State v. Hamilton,* 740 S.W.2d 208, 211 (Mo.App.1987) (dicta not to be followed: "Although where a defendant will not testify and has no other evidence or testimony there may be no basis for an opening statement on his part, the ruling does not prevent the statement of what he expects to prove as a defense *if* he will have evidence.").

■ The scope of opening statements is within the discretion of the trial court. *State v. Brooks,* 618 S.W.2d 22, 24 (Mo. banc 1981). Review is only for abuse of discretion. *State v. Hall,* 982 S.W.2d 675, 680 (Mo. banc 1998). The trial court here erred in denying defense counsel the opportunity to make an opening statement that referred to cross-examination testimony.

### III.

■■ Error alone does not warrant reversal. *Hall,* 982 S.W.2d at 680. Reversal requires prejudicial error. *Id.*

Here, defense counsel wanted to reference the following facts she intended to elicit on cross-examination:

1. Shortly after the murder, Thompson was acting normal, not disturbed, and had no scratches, bruises, swelling, blood or bandages (testimony from Thompson's sister).

2. The police searched Thompson's car for forensic evidence linking him to the murder but did not find any (testimony from crime scene technicians).

3. Fingerprints found by the police near the crime scene did not match Thompson's (testimony from crime scene technicians).

4. The police were unable to match the bloody shoeprints found at the crime scene with the shoes Thompson was wearing at the time he turned himself in (testimony from criminalist).

This was a circumstantial evidence case, as the State admitted from start to finish. The trial lasted three days, with testimony from 15 witnesses. This was the kind of case where an effective opening can make a difference. Demonstrating the importance of an opening statement, the State painted an elaborate picture of its case by delivering a 25–page opening statement detailing the facts to be elicited from State witnesses. The jury had a context for the State's evidence as it was offered.

In contrast, defense counsel was unable to outline the facts supporting her theory of the case. Her four-line opening statement could not reference any exculpatory facts, nor provide a context as they were presented. During trial, jurors had only one framework to view the evidence—the State's. Not until closing argument did jurors learn the importance of the facts elicited on cross-examination.

Most importantly, the judge sustained an objection to defense counsel's opening statement. Thus, the judge not only precluded the defense from referencing exculpatory facts, but in this case, effectively denied defense any opening statement. See *State v. Barton,* 936 S.W.2d 781, 788 (Mo. banc 1996). There is a reasonable probability that, in the absence of the abuse of discretion, the verdict would have

been different. Therefore, Thompson was prejudiced by the trial court's abuse of discretion.

## IV.

This Court need not address Thompson's points attacking the sufficiency of the evidence and the State's closing argument. The judgment of the circuit court is reversed, and the case remanded.

WHITE, HOLSTEIN, WOLFF, and PRICE, JJ., and RICHARD B. TEITELMAN, Sp. J., concur.

STEPHEN N. LIMBAUGH, Jr., C.J., concurs in part and dissents in part in separate opinion filed.

LAURA DENVIR STITH, J., not participating.

STEPHEN N. LIMBAUGH, JR., Chief Justice, concurring in part and dissenting in part.

I concur in all respects except the question of prejudice. I would hold that due to the overwhelming evidence of guilt, there was no reasonable probability that the verdict would have been different had the trial court allowed defense counsel to present the cross-examination evidence in an opening statement. Tellingly, the majority omits a recitation of the state's case. The facts of this case, taken from the Court of Appeals opinion, are as follows:

Bruce Thompson and the victim, Lynn Thompson, who were not related by blood or marriage, began living together in late 1996 or early 1997. They lived together with their daughter, Raylynne, who was almost two years old. Lynn's two children from a prior relationship, Wesley, age thirteen at the time, and Sharday, age twelve at the time, also lived with them. In July 1997, Lynn and the children moved in with her mother. After a week, Lynn and Bruce

made up, and she and the children moved back in with Bruce.

On the afternoon of Sunday, September 21, 1997, a neighbor saw Lynn and Raylynne outside washing a car in Lynn and Bruce's driveway sometime between 3:30 and 4:00 P.M. After they were done washing the car, Lynn and Raylynne both went inside the house. The neighbor did not see Lynn again; however, the neighbor did see Bruce and Raylynne leave the house around 7:00 P.M. The neighbor saw Bruce return to the house ten to fifteen minutes later, change cars, and drive away. Ten minutes after that, the neighbor again saw Bruce return to the house and then leave with a duffel bag.

Meanwhile, Lynn's mother, Betty, became concerned when Lynn did not arrive at Betty's house to pick up Wesley and Sharday, whose father had dropped them off there after his weekend visitation. Lynn was scheduled to pick up Wesley and Sharday between 6:00 and 6:30 P.M. Lynn was rarely late picking up the children after visitation with their father and, if she was going to be late, she always called Betty to let her know. Since Lynn was not there, Wesley and Sharday's father, Joe McLaughlin, took Sharday with him over to Lynn's house to check on Lynn, but they did not see Lynn's car in the driveway. They did notice that a television was on in the back bedroom, but no lights were on in the house. Since they could not locate Lynn, Wesley and Sharday spent the night at Betty's house.

At around 8:00 P.M., Bruce and Raylynne arrived at the home of Bruce's sister, Edwinna. Bruce asked Edwinna to watch Raylynne while he "made a run." According to Edwinna, Bruce would occasionally ask her to watch Raylynne for him for brief periods of

time while he went to the store. Edwinna agreed to watch Raylynne while Bruce made a run. Bruce did not return to pick up Raylynne that night. Edwinna had never kept Raylynne overnight. The next morning, Monday, Edwinna discovered Bruce's Volvo parked to the side of her house.

By Monday morning, Betty had still not heard from Lynn. On normal weekdays, Lynn would drive Wesley, Sharday, and Raylynne over to Betty's house between 6:15 and 6:30 A.M. Wesley and Sharday would catch the bus from their grandmother's house, and Raylynne would stay with Betty during the day while Lynn worked. When Lynn did not show up at her mother's house with Raylynne or show up at work, Betty called Joe, who came over and got Wesley. Joe and Wesley went over to Bruce and Lynn's house. All of the doors were locked. Because only Bruce and Lynn had keys to the house, Joe and Wesley knocked on the door and called out for Lynn, Bruce, and Raylynne. When no one answered, Joe and Wesley went to the homes of various relatives to try to find Lynn. Joe and Betty then decided to call the police.

Joe and Wesley met the police at Bruce and Lynn's house. The police noted that there were no signs of forced entry into the house. Since two of the front windows of the house were open, the police suggested that Wesley go in through one of the windows and unlock the front door. Wesley did so, and the police searched the house. Eventually, the officers found Lynn's body, covered by a sheet, in the basement near the door to the washroom. Lynn had been stabbed eight times. Two of the stab wounds would have been fatal. Additionally, she had cuts and bruises on the front and back of her head, and she had cuts and bruises on her neck that indi-cated she had been strangled. Lynn's purse and its contents were on the floor of the washroom, along with pieces of freshly-broken wood and one of Lynn's earrings.

Lynn's body was lying on contact paper. Underneath her body, and leading away from her body towards the basement door, the police found very large bloody shoeprints. The bloody shoeprints continued out of the basement door and on to steps that led up to the garage. The police also found drops of blood on the doorknob of the basement door, at the top of the stairs from the basement to the garage, on the garage floor, on a trash bag in the garage, on the doorway between the garage and the kitchen, on the kitchen floor, on the bathroom floor, and in a plastic bag in the bathroom trash can.

Because they had found Lynn's body, the police asked the media to broadcast that they were looking for Bruce and Raylynne. That evening, after Edwinna heard on the news that her brother and Raylynne were missing, she notified the police to let them know that she had Raylynne. The police came over to her house, and searched Bruce's Volvo. The police found a pager in the Volvo. There was no evidence that Bruce carried a pager. Lynn, however, had relied on a pager to let her know when people were trying to contact her because she and Bruce did not have telephone service at their house.

Within days after Lynn's death, Bruce called Edwinna, who told him that the police were looking for him. Bruce also had contact with their brother, Gregory Thompson. The police searched Gregory's home, and found a large knife. A test to detect for the possible presence of blood on the knife resulted in a "fairly significant" positive reaction.

Prior to Lynn's death, Edwinna saw Bruce two to three times a week and sometimes on the weekend. After Lynn's death, Edwinna did not see her brother from the time he dropped off Raylynne until the day before he surrendered himself to the police on November 10, 1997, forty-nine days after Lynn's body was discovered. After waiving his *Miranda* rights, Bruce told detectives that the last time he saw Lynn was on Sunday, September 21, 1997. He also told the police that he did not know what had happened to Lynn. During the interview, the police noticed what appeared to be scars and healed lacerations on both of Bruce's hands.

The police took a sample of blood from Bruce to compare to blood spots found throughout the house. Although there was not enough blood on several of the drops found throughout Bruce and Lynn's house to perform the type of DNA test that was currently being performed in Kansas City, the police were able to conduct DNA testing on the blood spots found on the basement doorknob, the garage floor, the bathroom floor, and the plastic bag in the bathroom trash can. The DNA tests showed that the blood spots found in these places matched Bruce's blood.

In light of this evidence, the trial court's error in disallowing defendant's opening statement would have had no impact whatsoever on the outcome of the trial. Furthermore, the evidence defendant sought to mention in opening statement was in fact introduced via cross-examination of the state's witnesses, and as the majority concedes, defense counsel reviewed and emphasized that evidence in closing argument. Finally, none of the four "facts" that defense counsel intended to present in opening statement—that defendant was acting normal after the murder, that no inculpatory evidence was found in defen-

dant's car, that there were fingerprints near the crime scene that did not belong to defendant, and that bloody shoeprints at the crime scene did not match the shoes defendant wore when he turned himself in—appear to be particularly exculpatory. Whatever inferences that can be gleaned from those "facts" do not negate the bulk of the evidence of guilt.

Under these circumstances, I would affirm the judgment of conviction and sentence.