

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD78078 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | July 26, 2016 |
| EDWARD H. PENNINGTON, JR., | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Justine E. Del Muro, Judge**

**Before Division Two:** Karen King Mitchell, Presiding Judge, and
Cynthia L. Martin and Gary D. Witt, Judges

Edward H. Pennington, Jr., appeals, following a jury trial, his convictions of felony resisting arrest, § 575.150,[1] and possession of a controlled substance, § 195.202, for which he was sentenced to concurrent two-year sentences. Pennington raises two claims on appeal; he argues that the trial court erred in both limiting his opening statement and admitting a State's exhibit without a proper chain of custody. Finding no reversible error, we affirm.

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2010 Cumulative Supplement.

## Background[2]

On April 4, 2011, around 11:35 p.m., Detective Hobart Price and Officer Vincent Lolly of the Kansas City Missouri Police Department were on patrol when they noticed a silver Lexus drive by. The Lexus caught their attention because the rear driver-side door opened and closed while the vehicle was traveling 35-40 miles per hour. The officers began following the vehicle. While doing so, they saw the door open again, and Detective Price could hear a female voice screaming for help. The Lexus slowed to almost a stop, the door opened again, and a woman in the backseat leaned out, again screaming for help.

When the Lexus was nearly stopped, Detective Price jumped out of the patrol car and yelled at the driver, through the open door, to stop the car. The driver, later identified as Pennington, "took off," so Detective Price got back into his patrol vehicle, activated the lights and siren, and pursued the car. Pennington ran numerous stop signs and drove at speeds exceeding 70 miles per hour through residential neighborhoods. At one point, the Lexus crested a hill, driving in the oncoming traffic lane, at a speed in excess of 70 miles per hour, and sparks flew from underneath the car when it came down. During the entire pursuit, the woman in the backseat was waving her arms and asking for help.

Other officers joined the pursuit, and one was able to deploy a stop stick, which struck one of the tires of Pennington's vehicle. When Pennington attempted to turn right, he lost control and slammed the car into a tree. Pennington then jumped from the car and fled on foot. He was eventually caught by the officers, but he continued to resist by struggling and refusing to put his hands behind his back. One officer deployed a taser to obtain compliance, and the officers were able to take Pennington into custody.

---

[2] "An appellate court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict and disregards all contrary evidence and inferences." *State v. Fritz*, 480 S.W.3d 316, 318 (Mo. App. S.D. 2016).

Pennington was then transported to police headquarters for booking. When the booking officer placed Pennington's socks in a property bag, she felt something hard, so she shook the sock upside down, and a clear baggie with a white, rock-like substance fell out, onto the counter. The booking officer placed the baggie inside an envelope and gave it to her supervisor. The supervisor requested the arresting officer's name, so the booking officer indicated it had been Detective Price. The supervisor then contacted dispatch to have Detective Price return to the detention area. The supervisor performed a field test on the substance, which showed positive for crack cocaine. Detective Price then placed the substance in a bag, heat-sealed it, and marked it with his initials, the case number, and the date and time of the sealing. Detective Price placed the sealed evidence in the locked property bin where it remained until it was transported by an evidence courier to the Kansas City Regional Crime Lab and placed into a secured vault. Zachary Skinner, a Forensic Specialist 4 in the Drug Analysis Unit, removed the sealed bag from the vault, broke Detective Price's seal, and tested the substance. His testing revealed the rock-like substance to contain .016 grams of cocaine.

Pennington was charged as a persistent felony offender with felony resisting arrest, § 575.150, and possession of a controlled substance, § 195.202. Before trial, the State filed a motion in limine, seeking to exclude testimony from Dr. Marilyn Hutchinson, Pennington's endorsed expert witness whom he intended to call to support a diminished capacity defense. The State argued that Dr. Hutchinson's opinion regarding Pennington's diminished capacity was based upon Pennington's own voluntary drug intoxication. The trial court sustained the State's motion insofar as it precluded Dr. Hutchinson from testifying that Pennington's diminished capacity was related to voluntary drug intoxication but allowed Dr. Hutchinson's opinion to the extent it was based upon any mental health diagnoses independent of drug usage.

During Pennington's opening statement, trial counsel advised the jury that Pennington "suffers from several mental health issues: [m]ajor depression, P.T.S.D., paranoia and personality disorder." Trial counsel noted that Pennington's medications had been cut off at the beginning of 2011, and he had not received medication for nearly four months when the charged crimes occurred. Trial counsel suggested that Dr. Hutchinson would testify that, on April 4, 2011, "Mr. Pennington was not thinking rationally because he was without his meds for so long." Trial counsel began to tell the jury that, once Detective Price encountered Pennington, Pennington's "mental health issues really began to show themselves." Trial counsel started, "Dr. Hutchinson will tell you that his P.T.S.D. came back in the fear—"; but counsel was cut off by an objection from the State, arguing that this was not "appropriate testimony of Dr. Hutchinson" and was "not in her report." In response, trial counsel advised the court: "I expect her to testify that the reason that he ran from him, ran from the—" but the State again interposed, arguing, "That's not what she says in her report." The court then advised trial counsel, "You have to stick to what's mentioned in her report. I'm afraid if it's not in there then we can't do that, okay?" Trial counsel acknowledged the court's ruling and then continued her opening statement, advising the jury: "Now Dr. Hutchinson will come in and she will testify about his mental health issues and how that affected his thinking on April 4th of 2011." She concluded the opening statement by asking the jury to "find [Pennington] not guilty of resisting of a lawful stop because of his irrational thinking and diminished capacity that Dr. Hutchinson will be testifying to."

During Dr. Hutchinson's testimony, she indicated that Pennington suffered from post-traumatic stress disorder (PTSD) as a result of witnessing a murder during a prior term of incarceration. Dr. Hutchinson further testified that, in her medical opinion, Pennington was not

4

thinking rationally when he fled from police. On cross-examination, Dr. Hutchinson acknowledged that Pennington told her the reason he fled was because he believed that outrunning the police would give him time to "help out" his daughter before he was arrested.

In closing argument, trial counsel suggested to the jury that Pennington's PTSD is what caused him to flee from the police, "feeling the fear of going back to prison because of the murder he witnessed there." The jury found Pennington guilty as charged, and the court sentenced him to concurrent two-year sentences. Pennington appeals.

## Analysis

Pennington brings two points on appeal. First, he argues that the trial court erred in limiting his opening statement by sustaining the State's objection when Pennington tried to tell the jury what he believed Dr. Hutchinson would say in her testimony. Second, he argues that the court erred in admitting State's Exhibit 7 (the crack cocaine) because there was an insufficient foundation laid insofar as there was a break in the chain of custody. We find no reversible error and affirm.

### A. Pennington suffered no prejudice from the limitation on his opening statement.

In his first point, Pennington claims that the trial court erred in sustaining the State's objection to a portion of his opening statement wherein he attempted to characterize what he anticipated to be part of Dr. Hutchinson's testimony. We disagree.

"The scope of opening statements is within the discretion of the trial court." *State v. Gilbert*, 103 S.W.3d 743, 751 (Mo. banc 2003). "Review is for abuse of discretion." *Id*. "Error alone does not warrant reversal[; r]eversal requires prejudicial error." *Id*. Because "[t]he primary purpose of an opening statement is to inform the judge and jury of the general nature of the case, so they may appreciate the significance of the evidence as it is presented," prejudice

5

occurs when the defense is "unable to outline the facts supporting [the defense] theory of the case . . . [or] provide a context [for the facts] presented." *State v. Thompson*, 68 S.W.3d 393, 394, 395 (Mo. banc 2002).

To begin, it is not clear from Pennington's argument or the record before us whether the trial court's ruling was in error. While on appeal Pennington argues that his counsel was prohibited in opening statement from linking his "mental state on the night of the offense with his PTSD and accompanying fear of being arrested and going back to prison—the very site where he witnessed the trauma that started the PTSD," at trial Pennington's counsel never specified the exact testimony she sought to outline but was precluded from mentioning. The record reflects only that, after the prosecutor objected to Pennington's outline of Dr. Hutchinson's testimony including information not included in the doctor's report, Pennington's trial counsel stated that she "expect[ed] [Dr. Hutchinson] to testify that the reason that [Pennington] ran from [Detective Price], ran from the—[.]" But trial counsel was interrupted by the prosecutor and never finished her thought, so the record does not show the reason for Pennington's flight that trial counsel expected to elicit from Dr. Hutchinson. Pennington made no attempt during the opening statement to indicate that Dr. Hutchinson would testify that he suffered from PTSD as a result of witnessing a murder during a prior term of incarceration. Furthermore, Pennington has not included Dr. Hutchinson's report in the record on appeal. Consequently, we cannot determine whether such an opinion would have been admissible evidence and therefore a proper subject of Pennington's opening statement.[3]

---

[3] We strongly question whether Dr. Hutchinson would have been allowed to testify as to the *actual* reason for Pennington's flight, as such an opinion would likely have been nothing more than speculation, based upon Dr. Hutchinson's best guess as to what Pennington was thinking. *See Goodwin v. State*, 191 S.W.3d 20, 38 (Mo. banc 2006) (noting that "witnesses could not have testified to what Goodwin was thinking at the time of the murder"). "Opening statements are limited to factual statements that can be proved." *State v. Thompson*, 68 S.W.3d 393, 394 (Mo. banc 2002). During the direct examination of Dr. Hutchinson, Pennington's counsel made no attempt to elicit testimony that Pennington's flight was linked to the source of his PTSD and the accompanying fear of going

Regardless of the propriety of the trial court's ruling, "[e]rror alone does not warrant reversal." *Id.* at 395. "Reversal requires prejudicial error." *Id.* An error in limiting opening statement cannot be deemed prejudicial if, despite the limitation, the defense is still able to outline the facts supporting the defense theory and provide a context for the facts to be presented. *Id.*

Here, Pennington's theory of defense was that, because of his PTSD, he was not thinking clearly when he fled; he was merely trying to avoid prison—the place where the incident occurred that led to the onset of his PTSD. Pennington's opening statement advised the jury of the diminished capacity defense, Pennington's mental health diagnoses (including PTSD), and his theory that those diagnoses affected his thinking at the time of the crimes. This was sufficient to provide the jury with a context in which to view the evidence to support the defense theory. Accordingly, we cannot say that Pennington was prejudiced by the limitation placed upon his opening statement, even if that limitation was made in error.

Point I is denied.

**B. The State laid a sufficient foundation for admission of the crack cocaine.**

In his second point on appeal, Pennington argues that the trial court erred in admitting State's Exhibit 7, the crack cocaine, because it lacked foundation due to the State's failure to adequately establish a chain of custody.

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016). "A trial court's decision regarding the exclusion or

_____

back to prison. Nor did Pennington elicit such testimony during his redirect of Dr. Hutchinson. It is difficult to imagine how Pennington was prejudiced by not being allowed to outline aspects of his expert's anticipated testimony that he did not seek to elicit. Dr. Hutchinson's only testimony that touched upon a possible link between the cause of Pennington's PTSD, witnessing a prison murder, and his decision to flee the police, came during the State's cross-examination of Dr. Hutchinson. Pennington was able to use this evidence to support his argument in closing that there was a link between the source of his PTSD and his decision to flee.

admissibility of evidence is reviewed for an abuse of discretion." *Id*. "A trial court abuses its discretion only if its decision to admit or exclude evidence is 'clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id*. (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)).

"In order to admit exhibits and testimony regarding tests performed on those exhibits, the trial court must be satisfied as to the identity of the exhibits and that the exhibits were in the same condition when tested as when the exhibits were originally obtained." *State v. Link*, 25 S.W.3d 136, 146 (Mo. banc 2000). "This may be proven by evidence establishing a chain of custody, but proof of a chain of custody does not require proof of hand-to-hand custody of the evidence, nor proof that eliminates all possibility that the evidence has been disturbed." *Id*. "The trial court may assume, absent a showing of bad faith, ill will or proof, that officials having custody of exhibits properly discharged their duties and that no tampering occurred." *Id*.

Here, Pennington argues that the State failed to establish a sufficient chain of custody insofar as the booking officer testified that she gave the substance to her supervisor, whereas Detective Price said that he received it from the booking officer. In other words, Pennington is relying on the lack of evidence as to how the drugs got back into the hands of the booking officer to establish a gap in the chain of custody. However, even if the lack of express evidence regarding the return of the evidence to the booking officer could imply a gap in the chain of custody, such a gap goes only to the weight of the evidence offered, not its admissibility. *See State v. Reed*, 811 S.W.2d 50, 55 (Mo. App. S.D. 1991). Further, Pennington has *not* alleged, either on appeal or below, that there was any bad faith, ill will, or proof of tampering; his sole complaint has been directed at this alleged break in the chain of custody. But, again, both the

trial court and this court may properly assume a lack of tampering in the absence of evidence to the contrary. *Link*, 25 S.W.3d at 146.

Furthermore, the alleged inconsistency between the statements of Detective Price and the booking officer does not necessarily establish a break in the chain of custody. The booking officer testified that standard procedure, when discovering what appear to be drugs, requires the booking officer to contact a supervisor for field testing. The supervisor then contacts the arresting officer (here, Detective Price) to have the arresting officer return to booking. Sometimes the supervisor will field test the substance before the arresting officer returns, but other times, the supervisor will wait for the arresting officer's arrival before field testing. But the arresting officer is always required to return—presumably to process any new evidence. Detective Price testified that, after the substance field-tested positive for crack cocaine, he was given the substance by the booking officer, and Detective Price then heat-sealed it and marked it with his initials, case number, and date and time of sealing. Though the booking officer did not testify that she directly handed the substance to Detective Price, it is reasonable to infer from the evidence that she did so. And, in the absence of any evidence suggesting otherwise, we will presume that standard procedure was followed and no tampering occurred. The State established a sufficient chain of custody for admission of State's Exhibit 7.[4]

Point II is denied.

---

[4] The State also argues that the chain of custody was irrelevant because three witnesses testified at trial and positively identified the crack cocaine. Though we agree with the State that, "if evidence can be identified at trial[,] there is no need to establish chain of custody," that proposition applies only where evidence is distinguishable. *State v. Davenport*, 924 S.W.2d 6, 10 (Mo. App. E.D. 1996). "The chain of custody is . . . necessary when evidence is not distinguishable[,] as is the case where items such as *drugs* are seized." *Id.* (emphasis added). Here, State's Exhibit 7 was the crack cocaine found in Pennington's sock. There is no indication that this rock of crack cocaine was in any way distinguishable from any other rock of crack cocaine; thus, the State was required to establish a chain of custody before the exhibit could be properly admitted.

**Conclusion**

Pennington failed to establish any prejudice from the trial court's alleged error in limiting his opening statement, and the State established a sufficient chain of custody for admission of the crack cocaine. The trial court's judgment is affirmed.

_____
Karen King Mitchell, Presiding Judge

Cynthia L. Martin and Gary D. Witt, Judges, concur.